**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:13-cv-01997-CMA-MJW

MARY LESTER,

Plaintiff,

v.

CITY OF LAFAYETTE, COLORADO,

Defendant.

---

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

---

**RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS
(RDSUMF)**

1.      Admitted.

2.      Admitted.

3.      Admitted.

4.      Admitted.

5.      Admitted.

6.      Admitted that she felt that she did not need to be professional with the
officers.  She asked them to close the gate so that her dogs didn't get out of the yard.
They ignored her request, left the gate open, and dogs got out.  They treated her with a
lack of respect so they didn't deserve a return showing of it.  Plaintiff did not surrender
her First Amendment rights to tell the police that they weren't doing their job
appropriately when she became employed by the defendant.  She was exercising those
rights and should not have been subjected to discipline for off duty private conduct.  The

1

reprimand speaks for itself.  Denied that the reprimand would have occurred even without her daughter's manic episode.

      7.     Admitted that the statements attributed to plaintiff were made. Cheesman's choice not to terminate her employment over the incident is not a material fact.  What he "could have done" is irrelevant.

      8.     Admitted.

      9.     Admitted.

      10.    Denied that she "may have" called Cheesman an idiot to her subordinates. Her testimony was "not that she could recall, no."  Ex. A, p. 260, line 13-15.  She followed that up by saying that if one of her subordinates says she said that they would be dishonest.  Id., line 16-18.  Plaintiff admits to having taken a narcotic at work.  These facts are not material.  Plaintiff was not disciplined for calling Cheesman a name.  She was taking a prescription medication of vicodin for her back injury which was the "narcotic" she took while she was at work.  Id., p. 268, line 6-8, p. 286, line 5-p. 287 line 14.  It was not a secret that she was taking it.  Id., p. 263 line 22-25.  While plaintiff admitted that Cheesman *could* have terminated her over the allegation that she was drunk at work under the at-will statute he did not actually do so.  This fact is immaterial. Plaintiff was not actually under the influence of alcohol at the event in April 2012.  Id., p. 267, line 14 - p. 268 line 5.

      11.    Admitted that she has sued over the termination of her employment as that was a materially adverse action.  Denied that the termination was the only act of discrimination.  Her amended complaint makes clear that Cheesman's discipline of her

over the incident that her daughter caused in June 2011 is evidence of the Defendant's discriminatory animus toward her.  See ¶ 22-26 of Docket #17; Ex. A, p. 60 line 10-12.

12.    Admitted.

13.    Admitted that City policy requires the City Administrator approve of a termination.  Admitted she did not tell Klaphake of her daughter's illness.  Denied that Klaphake never knew of her daughter's illness.  His testimony that he did not know of her illness is a matter for a jury to assess his credibility.  When a defendant moves for summary judgment, even the *uncontradicted* testimony of interested witnesses supporting the employer, such as supervisors and other workers, should not be considered or otherwise weighed.  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 149-151 (2000).  Cheesman knew of Kaylin's bi-polar disorder, and he was the person who signed the termination notice.  Ex. A, p. 74 line 5 – p. 75 line 21; p. 59 line 6 – 20; Ex. B.

14.    Denied as stated.  When asked whether she discussed her daughter being bi-polar with Mr. Cheesman during the reprimand over the June 2011 incident with the police plaintiff stated that she *did* discuss the fact that Kaylin was bi-polar.  Ex. A, p. 59, line 13-20.  There was no equivocation about what they spoke about as asserted by Defendant.  Admitted that there is no written confirmation of that conversation.

15.    Plaintiff admits the first four sentences.  Denied that insurance costs were not shared with Klaphake or Cheesman and that insurance costs were not a basis for plaintiff's termination.  Hayes' affidavit is a matter for a jury to assess her credibility.  See citation to *Reeves* as set forth in RDSUMF#13.  Furthermore, there were costs to

the city for its employees' insurance.  Ex. A, p. 97 line 19-22.  At all city meetings and employee benefit open enrollment meetings, where Mr. Cheesman and Human Resource employees including Sarah Hayes were present, Human Resource employees stated time and again the importance of the City's Employee Wellness Program in lowering the high cost of the city's insurance premiums.  Human Resources urged all employees to join the Wellness Program, get a Recreation Center pass, workout, and attend 1 hour wellness workshops on health issues, in an effort to save the city money through the lower insurance premiums associated with reduced chronic illness.  Ex. C, ¶4.

16.     Admitted that plaintiff does not know whether employees' medical expenses would have been identified in an annual budget of Cheesman's.  Denied that such expenses were not in any budget.  Hayes' affidavit stating these facts is a matter for a jury to assess her credibility.  See cite to *Reeves* in RDSUMF#13.  Admitted that she has not presented any documentary evidence that there were discussions about medical costs between Cheesman and HR.  Denied that there were no discussions about medical costs with Cheesman.  Hayes' testimony on this point is not required to be accepted at summary judgment.  See cite to *Reeves* in RDSUMF#13.

17.     Admitted that the statements were made by her and her daughter.  Denied that they constitute material facts.  Courts are not to presume that because one person of a protected group was not the victim of discrimination does not mean that discrimination did not occur against another member of a protected group.  See *Strickland v. UPS*, 555 F.3d 1224, 1230 (10thCir. 2009).

18.     Admitted.   Denied that this is a material fact as the failure of plaintiff to complain of discrimination prior to her termination is not a prerequisite to filing a claim of discrimination.

19.     Admitted.  However, Fournier's opinion of Cheesman is not a material fact in this case.  Just because he has not expressed an open animus toward her does not mean that he did not discriminate against her mother for her association with Fournier.

20.     Admitted that plaintiff understood she was required to comply with all City policies including the anti-harassment/discrimination policy.  Plaintiff admits that she never reported any discrimination she experienced while working for the City.  Denied that this is a material fact.  Plaintiff denies that there was a theft of money from the center involving her daughter.  Defendant fails to provide the full deposition testimony on this subject.  Lorna found some money in the door handle.  Ex. A, p. 224, line 18-21. They didn't even know the money was gone before that discovery.  Id., line 20-23. Plaintiff had no proof that her daughter had taken the money and it was found on the premises.  Id., line 10-13.   There was not even any evidence that a crime had been committed.  Id., line 16.  Denied that the incident with the money is a material fact. Whether plaintiff or anyone else failed to report what "could" have been a theft was not at issue with regard to her termination.  Plaintiff admits not using the open door policy when she was disciplined for an incident which stemmed from her daughter's emotional illness.  Denied that this is a material fact.

21.     Admitted that Plaintiff was in charge of the flooring project and the one responsible for obtaining bids, corresponding with vendors, and submitting the staff report to her supervisor (Cheesman) for his approval first before he passed it on to City

Council.  Denied that it was her responsibility to submit it to City Council.  Ex. A, p. 142

line 13-18; p. 143 line 3-7; p. 147 line 17-22, p. 148 line 11-14; p. 149 line 10-20.

Denied that it was her responsibility to order the product.  Id., p. 131 line 12 – p. 132 line

10.  Admitted that she was the vendor's sole point of contact on the project.

 22. Admitted.

 23. Admitted.

 24. Admitted that there was a Policy Manual that was in place during plaintiff's

tenure which has a purchasing policy indicating that for projects over $7,499, three bids

be obtained and presented to City Council.  Admitted that plaintiff knew that city council

approval was required as to the senior center flooring project at issue.

 25. Admitted that plaintiff followed §44-45 of the Municipal Code when

obtaining the bids for the senior center flooring project.  Denied being "uncertain"

whether she was aware of the Administrative Policy Manual and its policies governing

purchasing and bidding.  The deposition does not support Defendant's factual

contention.  Defendant's assertion that plaintiff's prior supervisors confirmed that plaintiff

complied with the Policy Manual bidding procedure when they were her supervisors is

not supported by their affidavits.  The fact that plaintiff may have obtained three or more

bids on any particular instance does not mean that plaintiff was aware of a three bid

*minimum* for all projects over $7,499.  Admitted that she had previously been

responsible for bids on other projects and had obtained more than two bids on some

occasions.  Ex. D.  Ms. Lester mentioned complying with Municipal Code Section 44-

46(d)(2) and (3) even though she also acknowledged that there are three bids.  Id.

26.     Admitted that plaintiff never went to Cheesman or Klaphake to confirm whether she should follow §44-45 of the Municipal Code or the policy manual.  Denied that she failed to follow §44-45 of the Municipal Code in that she did not obtain informal quotes.  The policy states informal quotes "may" be obtained orally.  Ex. A, p. 156, line 3-13.  Plaintiff simply liked them to be in writing.

27.     Admitted.

28.     Admitted.  Denied that this is a material fact.  There was no duty for plaintiff to do so.  Telling one vendor that another vendor had placed a bid would have been improper and viewed as an effort to force a vendor to lower its price.  Additionally, CarpetOne knew that Troy Von Roenn (hereinafter referred to as "Troy" to avoid confusion because his company was referred to as TVR Tiles and his brother Sean Von Roenn was also employed by Defendant) was operating his own business of TVR Tiles while he was doing installation work for it.  Ex. E, p. 90 line 11-21.  No one from CarpetOne had ever told Troy that he couldn't do any installation work for a project for which he had also submitted a bid on behalf of TVR Tiles.  Id., at p. 90 line 22 – p. 91 line 3.  After the events CarpetOne did not require that Troy notify it that he had submitted a bid on the same project in which CarpetOne had submitted a competing bid.  Id., at p. 91 line 3 - 10.

29.     Admitted.

30.     Admitted.

31.     Admitted.  However, Plaintiff was not informed by DeRosier that Troy was CarpetOne's primary installer and that he would perform the work when she provided the estimate to Ms. Lester in October or when the bid was submitted in early December.

Ex. C, ¶5.  This fact is immaterial to the issues in this case as Plaintiff only learned that

Troy would be performing the installation for CarpetOne late in December of 2011, and

at that time the information was put on the bid.  Ex. E, p. 37 line 1-8, p. 48 line 22-25, p.

49 line 1-15; Ex. F and G.

32.    Admitted that Troy became aware of CarpetOne's bid for the senior center

flooring project when he received a phone call from DeRosier.  In that call he told her

that he had submitted a bid for the project.  Ex. H, p. 66 line 9-10.  She asked him if he

would do it for his normal price.  Id., p. 67, line 20-23.  He had a second call with her

when she asked if he would provide a lifetime warranty on his work.  Id., p. 67 line 17-

23, p. 68 line 10-21.  Troy's two calls with DeRosier took place after Christmas, 2011

and before December 29, 2011.  Id.

33.    Admitted.

34.    Admitted that prior to Council approval plaintiff sent an e-mail to DeRosier

directing that product be ordered and that she did not copy Cheesman, mention him, or

mention approval by him.

35.    Admitted that it was a bad practice and not in compliance with policy to

order the product before council had voted.  Admitted that plaintiff did not have the

authority to make a decision herself on which vendor to use and that it was council who

had to approve a vendor.  Admitted that she ordered the product about a month prior to

receiving any approval from Council.  Defendant's next statement is inappropriate as a

purported statement of material fact.  Plaintiff admits that neither she nor CarpetOne is

in possession of any documents which show Cheesman's signature approving the

ordering of the product.  Denied that her description of the document Cheesman signed

has "changed".  The testimony shows that Plaintiff does not remember specifically the nature of the document Cheesman signed.

36.   Admitted.

37.   Admitted that plaintiff was aware that Troy would receive a financial benefit from the awarding of the contract based upon the first two bids she obtained but she only learned of that at the time that CarpetOne was asked to provide a lifetime labor warranty and it informed her that it had chosen Troy to perform the labor portion of the contract late in December.  Ex. E, p. 37 line 1-8, p. 48 line 22-25, p. 49 line 1-15; Ex. F & G.  Defendant's support for its assertion does not track Ms. Lester's testimony. Defendant leaves out the fact that while the Staff Reports contain Ms. Lester's name as the author of the report it ignores the fact that there are five separate versions of the Staff Report in question dated the same date (even though there are several e-mails showing that there were multiple revisions over a several day period) and Ms. Lester's testimony is that Cheesman and Sean Von Roenn (hereinafter referred to as "Sean") were both involved in making revisions to the staff reports.   Ex. A, p. 142 line 13-18; p. 143 line 3-7; p. 147 line 17-22, p. 148 line 11-14; p. 149 line 10-20; Ex. Q, R, S, T, and U.  Denied that when she submitted the initial staff report she had only solicited two bids which both materially benefitted Troy.  The bid from CarpetOne did not involve Troy until later in the process when Cheesman wanted a reason to accept CarpetOne's bid over Hunter which was the third bid that was obtained.  Id.   Admitted that Klaphake asked about a third bid and that he wanted a local bid.  Admitted that she never informed Klaphake that TVR Tiles was a local bid.  She did inform Cheesman that TRVTiles was a local bid.  Ex. A, p. 146 line 3-14.  Furthermore, because he had obtained bids for

work on his own home from Troy on behalf of TVRTiles in the fall of 2009 Cheesman already knew that TVRTiles was a local company.  Ex. I.

38.     Admitted that the fact that Troy would materially benefit from both of the bids solicited by plaintiff regardless of which was chosen, was never relayed to Klaphake or Council by plaintiff.  Denied that Hansen's "opinion" that "Such information was important and plaintiff's secrecy and nondisclosure were inappropriate" is proper expert testimony. It is simply cumulative and therefore redundant of Klaphake's testimony.  Plaintiff previously filed a motion to strike Hansen's expert opinion as being improper expert testimony under Rule 702.  Docket # 19.  After the Court denied plaintiff's motion (Docket #54) Ms. Lester deposed both Klaphake and Hansen. Klaphake, who holds a master's degree in organizational management (Ex. J, p. 15, line 12-14), holds himself out as an expert in government ethics.  Id., p. 34 line 25 – p. 35 line 13.  He played a role in drafting the Defendant's municipal code of ethics as well as the policies and procedures.  Id., at p. 21 line 9-12; p. 23 line 8-13.  He is familiar with the policies and procedures and Defendant contends he was involved in plaintiff's termination.  He saw the termination letter before it was given to plaintiff.  Id. at p. 90 line 1-2, p. 92 line 16-19.   Given the preceding Hansen's testimony is simply cumulative of Klapahake's.  Hansen admits that Klaphake has the same ability as he does to read the policies and procedures and the code of ethics and to evaluate Ms. Lester's conduct as to whether she violated the city's policies and procedures.  Id., p. 63 line 18 - p. 64 line 3.  When given an opportunity to explain how his expertise, or experience, differs or provides any more help to a jury than Mr. Klaphake's opinions as to the propriety of Ms. Lester's conduct Mr. Hansen has no answer.  Id., p. 65 line 17 – p. 66 line 3.   To the

10

extent that Hansen's testimony is different from what is set forth in the termination letter it constitutes evidence of a *post hoc* reason and therefore can be viewed as pretext. Finally, Cheesman and Klaphake refused to answer questions about any conversations with HR about the issue, and with each other, and how it was determined that Lester would be fired, all on the basis of attorney-client privilege.  Ex. L, p. 149, line 8 – 11, p.151, line 16-20; Ex. J, p. 86, line 9 – p. 88 line 13; p. 92 line16-19.  Cheesman also refused to answer whether there is anything in the City's municipal code or the policies and procedures that says a person who owns a business cannot submit a bid and then provide the labor for the company that wins the bid for the project in question.  Id., p. 181 line 15-24.  He refused to say whether there was anything in the municipal ethics ordinance that stated Ms. Lester was required to notify anyone in management that Troy was going to be providing the labor for CarpetOne for the Senior Center Flooring Project.  Id., p. 184, line 24 – p. 185 line 7.  The defendant should not be allowed to take advantage of the fact that it hid behind the attorney-client privilege to refuse to answer questions about how plaintiff's conduct violated city policies or procedures and then be allowed to employ a hired gun to say something on the subject in their own managers' stead.  Defendant's action of hiring someone to present expert testimony on a subject that Defendant's managers should know and understand, since they were the ones who made the decision, is additional evidence of pretext.  Aside from the prior problems with Hansen's testimony it is not proper for his testimony to be given any weight at summary judgment, as it was paid for.  See citation to *Reeves* as set forth in RDSUMFt#13.

39.    Admitted that plaintiff spoke to Cheesman about the fact that her husband did HVAC work and that they had chatted about what her husband's idea was to solve

the big issue that was going on at the Senior Center.  Ex. A, p. 217 line 21-p. 218 line 1.

This fact is immaterial as Plaintiff was not disciplined for having that talk with

Cheesman.

  40. Admitted that Sean testified to this fact.  Denied that this is a material fact

because Sean was not a decision maker in the case and was not Ms. Lester's

supervisor.  His lay opinion is not relevant to the issues.  See citation to *Reeves* as set

forth in RDSUMFt#13.

  41. Plaintiff admits that she received a notice of termination on July 10, 2012.

The notice speaks for itself.  Ex. B.  Denied that the notice includes any language

stating that she was guilty of "bid rigging."  Plaintiff does not deny the language she

used at her termination hearing.  However, it was equivocal.  Furthermore, she did not

obtain the copies of the e-mails sent by Troy to Cheesman in 2009 when he was

submitting a bid for work on Cheesman's home until after she was terminated.  Ex. D;

Ex. C, ¶6.  Cheesman *did* know that TVRTiles was owned and operated by Troy at the

time of the bidding process and he didn't say anything at the time to plaintiff to indicate

that he was upset about it.  Ex. I.  The last sentence of the paragraph is unadulterated

argument and should be ignored.  Plaintiff has never acknowledged that she is guilty of

"bid rigging" and that term has never been set forth in any policies or procedures of

Defendant.

  42- 44.  Admitted.  These facts are immaterial.  Plaintiff was not required by law

to bring up disability discrimination at the time of her termination, when she retained an

attorney or when she applied for unemployment.

  45. Admitted.

46.     Admitted that Kaylin Fournier's testimony was that if her mother violated City policy and engaged in bid rigging, she should be disciplined for it.  The fact is immaterial.  Kaylin had no role in the decision to terminate her mother's employment.  Her "opinion" is no more valid than any other member of the general public and it does not establish that a violation of any policy or procedure occurred.

### PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS (PSAMF)

1.     Plaintiff's job performance prior to 2011 when the incident with her daughter occurred was rated as either "Exceptional", or "Successful."  Ex. M.  In 2011, after the incident with her daughter and the police, Cheesman rated her performance as "Acceptable".  Ex. N.

2.     The incident with the police occurred because Kaylin wanted her mother to give her back a television set.  During the course of the incident Mary told the officers that daughter was bi-polar and did not live with her.  Ex. O, ¶ 2 of p. 3 of 4.  The officer acknowledged that Plaintiff and her daughter were loud with each other.  Id.

3.     Ms. Lester asked the police officers to close the gate so her dogs wouldn't get out.  Ex. A, p. 47 line 19-25.  She got angry because they did not follow her request and the dogs got loose.  Id.  Plaintiff was worried that the dogs would be hit by a car.  Id, p. 48 line 1-4.  Ms. Lester said to the officers that she would sue them if one of her dogs was hit by a car and killed because they had failed to close the gate.  Id., at p. 48 line 9-13.  Officer Fields admitted that Plaintiff became upset when she learned that the dogs were loose.  Ex. O, ¶ 2 of p. 3 of 4.  She also admitted that plaintiff *asked* if she could sue everyone involved.  Id., at ¶ 2, p. 4 of 4.  She did *not* acknowledge in her report that Plaintiff had asked them to shut the gate and make sure the dogs did not get loose.

4.      The e-mail sent by Hill to Bashor, which was later forwarded to Cheesman, stated that plaintiff was yelling during the encounter but failed to mention that Ms. Lester was yelling at her daughter.  Ex. P.  Hill also failed to mention that Ms. Lester asked if she could sue the police department because they let her dogs out of the yard and she was worried they would be hit by a car.

5.      Cheesman can't explain why he took more than a month to issue the discipline to Ms. Lester other than that someone else was investigating.  Ex. L, p. 25 line 19 – 23.  He doesn't even know what investigation Ms. Hayes conducted.  Id., at p. 25 line 24 – p. 26 line 2. He didn't speak to any of the officers involved.  Id., p. 30 line 14-20, p. 34 line 12-14.  He doesn't know how Ms. Lester was supposedly uncooperative as alleged by Corporal Hill in the e-mail.  Id.  When Cheesman spoke with plaintiff about the incident he didn't provide her with a copy of the e-mail he had received from Bashor.  Id., at p. 26 line 17-20.  He doesn't recall telling her the specific allegations about her behavior that evening.  Id., p. 26 line 21-23.  He didn't provide her with a copy of the police report and ask her if it was accurate.  Id., p. 26 line 24 – p. 27 line 2.  Cheesman didn't know that plaintiff's questions about suing the city had anything to do with the fact that the police had let her dogs out of the yard.  Id., p. 27 line 10-12.

6.      Cheesman understands that individuals have the right to express their opinions to the police about their conduct.  Ex. L, p. 28 line 23 – p. 29 line 7.  He also understands that if police officers act outside the scope of their duties or act in a manner that is not responsible that citizens have a right to tell the police that they are upset with them.  Id., at p. 29 line 12-18.

7.      Cheesman approved committing to CarpetOne to perform the work at the senior center even though there were only two bids at the time.  Ex. A, p. 132 line 2-15. He put it in writing but the document was left in plaintiff's desk file at the time of her termination.  Id., p. 131 line 12-20.  After plaintiff's termination, Cheesman provided a copy of her desk file, which would have included files relating to the bidding process for the Senior Center Flooring Project, to the city's lawyers.  Ex. L, p. 193, line 19 – p. 194 line 12.

8.      On December 19, 2011, Cheesman sent a draft of the staff memo on the flooring project to Sean.  Ex. Q.  On December 23 Ms. Lester wrote to Cheesman attaching the updated floor memo for City Council.  Ex. R, CITY 002404.  She had added both the bids obtained to that point and the name of the company, McDonald CarpetOne.  Cheesman wrote a followup e-mail to Gary Klaphake with a cc to Robert Wright and Sean on December 26, 2011.  He did not copy plaintiff on this e-mail – the woman who was supposed to be in charge of this process!  This version of the staff report indicated that TVR Tiles was one of the bidding companies.

9.      On December 27 Sean wrote to Susan Barker regarding the latest version of the staff report and Staff Report.  Ex. S, CITY 002398.  He did not copy Ms. Lester. That same day Klaphake sent an e-mail to Sean asking if Hunter Flooring from Lafayette had submitted a bid.    Klaphake called plaintiff that day and asked her to get a bid from Hunter.  Ex. A, p. 140 line 8 – 9.  Plaintiff called Cheesman and said she would get the bid.  Id., at line 9-10.  When she called Cheesman back and said that Hunter was lower than Carpet One he said that they could go with Carpet One if they could find a compelling reason to do so even if it wasn't the lowest bidder.  Id., at line

10-16. He asked her to call Carpet One and find out what they could provide that would justify going with it. Id., at line 17-18. Plaintiff contacted Carpet One and obtained the lifetime warranty on the labor. Id., at line 19-22.

10. On December 29, 2011, DeRosier signed the bid from her company that specifically stated that there would be "Lifetime Installation Warranty Provided by Troy Von Reonn (sic)." Ex. G. Prior to that date she had provided a bid with the same language but it did not contain a date. Ex. F. Ms. Lester asked April for a bid on official letterhead to go into the City Council packet. Ex. A, p. 208, line 6-11.

11. The final document that Ms. Lester prepared to go to City Council would have included the bids from the vendors. Id., p. 143, line 3-7. However, all staff reports went to Cheesman first for his approval and he retained the right to make revisions. Id, line 11-21. The bids should have been seen by Cheesman if he was in town. Ex. J, p. 83 line 4 – 14.

12. On December 29 Ms. Lester sent an e-mail to Sean asking him to review the last paragraph and to see if it seemed good. She stated that she had talked to Cheesman and added what he wanted. Ex. T. The staff report indicated that McDonald Carpet One had a lifetime warranty on labor and a 10 year warranty on material.

13. Sometime after this e-mail was sent the staff report was revised yet again and submitted in the council packet. Ex. U. That staff report mysteriously deleted any reference to TVR Tiles and the specifics of its bid, and instead added the following language at the bottom of the next to last paragraph: "The two other bids submitted were either substantially higher in cost or did not include a comparable warranty." Cheesman came back to town on the 31st or the 1st of January. Id., p. 97 line 5-13.

16

14.     While Klaphake claims that the failure of plaintiff to obtain three bids
resulted in the City being forced to take a bid that was not the lowest was the prime
reason he was upset and the main reason supporting her termination (Ex. J, p. 90 line
10 – p. 91 line 4) it was obvious at the time that plaintiff had not obtained the three bids
prior to being asked to do so by Klaphake.  For something that was purportedly so
serious Klaphake didn't even bring it up as a possible matter of discipline until two
months later in March! Ex. X.  Even at that point Klaphake only suggested that plaintiff
be given a warning, not a termination.

15.     In light of the e-mail Cheesman spoke to Ms. Lester about the restocking
fee and how she had come to order the materials from McDonald CarpetOne before
approval from City Council.  Ex. L, p. 115 line 3-15.  She told him that he had approved
the ordering of the materials and that he had signed something to that effect. Id., line
16-19.  She did not provide him with a copy of the document at that time, he did not try
to look for it, and he did not ask her to provide him with a copy.  Id., p. 115 line 20-23; p.
116 line 4-6.  He thought she was being untruthful when she told him that but he didn't
follow-up on it and let it drop!  Id., p. 115 line 24 – p. 116 line 15.

16.     In May and early June, Kaylin's problems worsened to the point that Ms.
Lester considered entering her into an in-patient treatment program to deal with her
drug and emotional (bi-polar) issues. Ex. Y.  The bills were mounting for Kaylin's
treatment because she was going to therapy two or three times a month.  Ex. A, p. 69,
line 22 – p. 70 line 4.  At that time plaintiff spoke with Sarah Hayes at the City to discuss
finding a dual diagnosis facility that would address both types of problems Kaylin was
dealing with.  Id., p. 93 line 12-16.  After much searching Plaintiff ultimately found a

place that could provide both types of treatment for Kaylin but it was in California and it was expensive.  Id., p. 70 line 1-4, p. 242 line 21 – p. 243 line 10.  Kaylin was there for 26 days.  Id., p. 243 line 14-20.

17.     It wasn't until July 10, 2012 that plaintiff's employment was terminated. Ex. B.  There was no mention at all in the termination notice stating that Ms. Lester's failure to obtain three bids was improper.  In fact, Cheesman states in the memo that going with a vendor who was not the lowest bidder was appropriate given that a lifetime labor warranty was provided as part of the contract.  Furthermore, nothing was mentioned about Ms. Lester subjecting the City to a restocking fee if the contract was not awarded to McDonald CarpetOne in order to take the lowest bid from Hunter.

18.     Cheesman states in the termination memo, of the two bids that were obtained by plaintiff one was from TVR Tiles and that he had later discovered that TVR Tiles was run out of the home of plaintiff's friend Troy.  Cheesman knew that Troy operated TVR Tiles as early as October 26, 2009.  Ex. I.  The e-mail he sent was in connection with a wood flooring estimate for a project at Cheesman's home.  The sender's name shows "Troy Von Roenn" and shows that it was sent from "TVR Tiles@yahoo.com."  Under the subject line it shows "TVRTiles, LLC flooring estimate for: Curt Cheesman."

19.     There was nothing in the termination notice setting forth that Ms. Lester should have notified the City Council that Troy would be performing the labor for CarpetOne.  This is because plaintiff had submitted the formal bid from DeRosier of CarpetOne which specifically set forth on its face that Troy would be providing the

lifetime warranty.  Ex. F and G.  Troy provided labor for many flooring companies in the area, *including* Hunter Flooring.  Ex. DD.

20.     Cheesman stated in the termination memo that he had learned that CarpetOne's bid had been "prepared by plaintiff's personal friend Troy Von Roenn." This was a falsehood.  Troy had no involvement in the preparation of CarpetOne's bid and Cheesman knew that.  Ex. AA.  Cheesman came into the store 3 to 4 months prior and asked if McDonald had done the flooring work for the Lafayette Senior Center.  At no time did McDonald tell Cheesman that Troy had provided DeRosier with sales and material selection portion of the contract.  Ex. E, p. 26 line 16- p. 27 line 2, p. 28 line 24 – p. 29 line 2, p. 51 line 10-12, line 22- p. 52 line 2, p. 75 line 23 – p. 76 line 9.

21.     Sean, who was involved in getting the staff report for the senior center flooring project ready for the Council packet, went to see Cheesman several weeks after the senior center flooring project was completed and told him that TVR Tiles was his brother Troy.  Ex. BB, p. 37 line 2-6; Ex. L, p. 219, line 4-12.  Cheesman asked why Sean had not disclosed this previously.  Sean claimed it was a big mistake not to disclose it during the process in December or January.  Ex. L, p. 219 line 19 – p. 220 line 4.  When he told Cheesman about it Cheesman wasn't upset.  Id., p. 33 line 5-19. Cheesman claims that it was poor decision making and that Sean was disciplined through a mention in his performance evaluation.  Id., line 10-12.  Klaphake doesn't have any knowledge of the discipline given to Sean.  Ex. J, p. 102 line 20–25.  Sean's performance evaluation mentions nothing about the senior center flooring project.  Ex. CC; Ex. J, p. 103 line 7-19.

## ARGUMENT AND CITATION OF AUTHORITY

I.      STANDARDS FOR RULE 56 MOTIONS

In discrimination cases, where intent and credibility issues inhere, summary judgment standards should be applied strenuously. *Stewart in Swenson v. Lincoln County School District 2*, 260 F.Supp.2d 1136 (D.Wyo. 20013).   At summary judgment, even the *uncontradicted* testimony of interested witnesses supporting the employer, should not be considered or otherwise weighed.  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 149-151 (2000).  A court should examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer.  *Washington v. Davis*, 426 U.S. 1229, 242 (1976).

I.      DEFENDANT'S ARGUMENT THAT PLAINTIFF WAS NOT "QUALIFIED"
        IS NOT SUPPORTED BY THE FACTS OR THE LAW.

Defendant's argument that Ms. Lester was not qualified for the position because she failed to follow the city's ethics policy exhibits a misunderstanding of the ADA.   A qualified individual with a disability is defined as: "[A]n individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  ADA § 101(8).  The determination of whether an individual is qualified is made in two steps: the first is to decide if the individual satisfies the educational, experience, skill, or license requirements for the position, and the second is to decide if the person can perform the essential functions of the position with or without reasonable accommodation.  29 C.F.R. pt. 1630 app. § 1630.2(m).

As to the first determination - Ms. Lester meets the objective standards for being

qualified under the law because she *held* the position of Senior Services Manager for a number of years.  Because this case does not involve a request for an accommodation, whereby the essential functions of the position are concerned, Ms. Lester proves by the fact that she was doing her job that she meets the second prong of the definition of "qualified."  The Court in *Larimer v. IBM*, 370 F.3d 698 (7th Cir. 2004) acknowledged that the general definition of "qualified individual" as applied to an associational claim was odd and that the plaintiff only had to show they were qualified to perform their job.  The case law cited by Defendant simply acknowledges that a person's failure to be able to attend work on a regular basis means that he or she is unable to perform the essential functions of the position and their holdings are inapposite here.

## II.   CHEESMAN, THE PERSON WHO MADE THE ADVERSE EMPLOYMENT DECISION, KNEW OF KAYLIN'S DISABILITY

First, and most importantly, Cheesman signed the termination notice so there is evidence in the record that *he* made the decision to terminate plaintiff's employment, not Klaphake.  See Ex. B.  Defendant relies solely on Klaphake's self-serving affidavit that boldly contravenes his assertion of the attorney-client privilege to refuse to answer questions about the termination decision.  See RDSUMF #38.

Second, and without admitting such, even if Klaphake made the decision, he did it based upon Cheesman's recommendation.  Defendant has failed to acknowledge that the "cat's paw" theory is just as valid in an associational claim as it would be in a traditional claim for discrimination.  "[T]he underlying principles of agency upon which subordinate bias theories are based apply equally to all types of employment discrimination."  *Simmons v. Sykes Enterprises, Inc.*, 647 F.3d 943, 949-50 (10th Cir. 2011).  So even if Klaphake made the decision he did it at Cheesman's suggestion and

21

the Defendant is liable under an agency theory.

III.    THERE IS A REASONABLE INFERENCE THAT HER
        DAUGHTER'S CONDITION WAS A DETERMINING FACTOR IN
        THE CITY'S DECISION TO TERMINATE HER EMPLOYMENT

While courts in other Circuits have described three typical factors that may arise

in an associational claim those factors are not the only ones that might motivate an

employer to terminate an employee and the 10th Circuit has not specifically held that

they are the only factors.  See *Trujillo v. PacifiCorp*, 524 F.3d 1149 (10th Cir. 2008).

While the expense factor is *one* aspect or category that plaintiff relies upon she also

relies upon the "embarrassment" factor.  The factors the Court arrived at in *Larimer v.

IBM*, 370 F.3d 698 (7th Cir. 2004) are not to be found in the statute itself and therefore

there is no reason that a Defendant could not have other reasons it wanted to get rid of

a person who has an association with a person with a disability.

In June 2011 when the police were called to plaintiff's house to address the

situation with her daughter it was an embarrassment to the City.  One of its managers

had a highly agitated and public shouting match with her mentally ill daughter over the

return of a television set.  Cheesman's discipline of plaintiff was clearly pretextual.

While he claimed that the write-up was not over a "minor domestic matter" the facts

speak otherwise.  Ms. Lester notified the police at the time that her daughter was bi-

polar and that she was having problems.  Cheesman did not conduct an investigation

into the matter, blindly accepted what the police said was the truth, and didn't provide

plaintiff with any specifics in criticizing plaintiff's actions.   He claims that Sarah Hayes

had investigated and it is clear she did no such thing.  Cheesman knows that a person

has the right to express themselves to the police as a matter of free speech under the

first amendment but he basically disciplined plaintiff for telling the police that she would

sue them if their negligence caused her dogs to be hit by a car.  He didn't even know

that she had said that because they had let her dogs out after she had asked them to

close the gate. Ms. Lester was acting reasonably to persons who ignored her request.

Cheesman accused her of being "uncooperative" when the police department did not

set forth how she had been uncooperative.  While this incident was an unfortunate by

product of Ms. Lester's daughter's mental illness the police department and Cheesman

just didn't want it to happen again.  The discipline over this incident was used, in part, to

justify plaintiff's termination.  Ex. B., p. 2.

As for the "expense" aspect the concern for lowering insurance premiums and

the timing of this case are such that there is an inference that the expense of her

daughter's medical condition was a motivating factor in the decision to terminate

plaintiff's employment, contrary to the protestations of Defendant.  Here is the evidence:

In "all city" meetings, with HR managers and Cheesman present, statements

were made by managers of the importance of the Defendant's Employee Wellness

Program in lowering insurance premiums (that were associated with chronic conditions)

and exhortations were made that employees should sign up. RDSUMF #15.

While plaintiff's actions concerning the bidding process for the senior center

flooring project were well known in December and early January, most particularly the

fact that she did not initially obtain three bids until asked to do so, no discipline was

taken at that time.  Klaphake suggested to Cheesman in an e-mail in early March that a

written warning should be issued for plaintiff's actions over that project and still no

discipline was taken.  PSAMF#14.  Cheesman thought plaintiff was being untruthful to

him when, in follow-up to Klaphake's e-mail, he questioned plaintiff about her actions, but he failed to take any discipline for that either.  PSAMF#15.

In May and June of 2012 Kaylin's condition worsened to the point that she needed inpatient treatment.  PSAMF #16. Ms. Lester had numerous conversations with Defendant's HR department regarding where Kaylin could receive the treatment that she required.  Because Kaylin needed a dual diagnosis treatment program for her mental illness and drug problems the options were somewhat limited.  Finally, around June 10 it was determined that Kaylin would go to an in-patient treatment center in California.  Ex. Y.  She was there for 26 days.  Ms. Lester's employment was terminated on July 10, 2012.  Ex. B.

Close temporal proximity is important in establishing a prima facie case of association discrimination case.   In *Trujillo v. PacifiCorp.,* 524 F.3d 1149, 1159 (10th Cir. 2008) the plaintiffs alleged that their employment was terminated with three and six weeks respectively after their son relapsed and was determined to have terminal cancer.  The Court relied on its prior ruling in the Den Hartog case. That panel specifically referenced consideration of the "circumstances" under which the adverse action arose as part of the fourth prong of the prima facie case.   *Den Hartog*, 129 F.3d at 1085.   The Court held that it is appropriate to consider the circumstances arose given the difficulty in establishing an "expense" case.   It acknowledged that, as in the case of discrimination claims in general, direct evidence of discrimination resulting from costs to the company will be rare. *Trujillo*, at __ citing *Phelps v. Field Real Estate Co.*, 991 F.2d 645, 649 (10th Cir.1993).   The Court held that where the temporal proximity is close, it is a circumstance that should be given considerable weight. (Where adverse

action follows within a month of protected activity the timing alone is sufficient on its face for a jury to find retaliation.  See *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1239-40 (10th Cir.2004)).

Here, Ms. Lester had not been disciplined for her role in the bidding for the senior center project after management's knowledge of her purported failings was well known. Ms. Lester had to admit her daughter to a dual diagnosis facility in California to treat her daughter's bi-polar condition and her drug addiction.  Less than a month later the City decided that her employment needed to be terminated.

Because of 1) the very short time lapse between plaintiff's request for in-patient treatment for her daughter and her termination, over something that had happened six months earlier, 2) the focus on keeping insurance premiums low by enrolling in the Defendant's wellness program, and 3) plaintiff's discipline over an incident involving the police which was caused by her daughter's bi-polar condition and the pretext surrounding that discipline, and which was reiterated as a reason for her termination, there is a reasonable inference that her daughter's disability was a motivating factor in plaintiff's termination.

IV.   PLAINTIFF'S TERMINATION WAS PRETEXTUAL AND
      DEFENDANT'S PURPORTED NON-DISCRIMINATORY REASON
      IS UNWORTHY OF BELIEF

Evidence of pretext may take any number of forms, including evidence that plaintiff "was treated differently from other similarly situated employees." *Kendrick v. Penske Transportation Services, Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).  An employer's purported reasons may be undermined by evidence that the company failed to adequately investigate the offense for which it purportedly terminated the plaintiff.

*Trujillo v. PacifiCorp.,* 524 F.3d 1149, 1159 (10th Cir. 2008).  "An employee may demonstrate that an employer's proffered, non-discriminatory reasons for an adverse employment action are pretextual by revealing the 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's explanation." *Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002).  This case has all three types of pretext evidence.

Plaintiff had above average performance evaluations for at least seven years prior to the year that Cheesman became her supervisor in 2011.  PSAMF#1.  In 2011 her evaluation, which was conducted after the incident with the police, was rated simply as acceptable.

Ms. Lester told the police that her daughter was bi-polar and did not live with her at the time of the incident.  PSAMF#2.  Even though Ms. Lester asked the police officers to close the gate her dogs got loose in the neighborhood because the officers didn't care about her property or the public safety and ignored her request.  PSAMF#3.  When she realized her dogs were loose Ms. Lester exercised her first amendment right to criticize the police for their lack of professionalism, including threatening to sue them if one of her dogs was hit by a car.

While the police report did include some facts favorable to Ms. Lester it was not complete and not accurate.  PSAMF#3.  For instance, even though the report stated that Ms. Lester was upset that her dogs got out the report did not show, and Cheesman did not know, that the reason Ms. Lester asked if she could sue the police was because she had asked them to close the gate so her dogs wouldn't get out and they failed to close it.  Id.  Yet Cheesman conducted no investigation to speak of and did not give Ms.

Lester a chance to respond to the specific allegations including that she had been uncooperative or even ask her if, and why, she had asked if she could sue the officers. PSAMF#5.  He knows that persons have first amendment rights as citizens to speak out to the police but he made no effort to get at the actual facts, even though he knew from the police report that Ms. Lester was upset at her daughter and that it was her daughter's manic episode that brought it all about.  PSAMF#6, #2.

Cheesman approved Ms. Lester's ordering of the product from CarpetOne even though there were only two bids at the time and city council had not yet approved the contract.  PSAMF#7.  The document is now missing but plaintiff left it in her desk file at the time of her termination.   Id.  Cheesman provided plaintiff's desk file to the Defendant's attorneys in this litigation.  Id.

Plaintiff did not have the role in getting the project approved as Defendant claims. For instance Cheesman sent an e-mail to Sean on December 19, 2011, which included a draft of the staff report.  PSAMF#8.  Sean was at the same level as Ms. Lester, and he was therefore similarly situated.  Ex. L, p. 76 line 14-16.

On December 23, 2011, Cheesman sent a follow-up e-mail to Klaphake and Sean after plaintiff had provided information about the senior center flooring project in the form of a draft staff report but mentioned only two bids, including one by TVR tiles. His e-mail tellingly did not make any comment about the lack of a third bid.  Id.

On the 27th Sean wrote Susan Barker regarding the most recent iteration of the staff report (the third version), once again without copying Mary Lester, the woman who was supposed to be in charge of this project.  PSAMF#9.  Later that day Klaphake sent an e-mail Sean asking if Hunter had submitted a bid but not copying plaintiff.

Klaphake contacted plaintiff later that day and asked her to obtain a bid from Hunter Flooring.  Id.  After getting the bid, Plaintiff called Cheesman and told him that Hunter was lower than CarpetOne's bid.  His response was that she needed to find out if there was a compelling reason to go with CarpetOne even though they were the higher bidder.  She called April and learned that it would offer a lifetime labor warranty on the installation.  Either that day, or the next, April submitted a bid on formal letterhead showing that Troy would provide a lifetime warranty on the labor.  PSAMF#10.  On the 29th April signed and dated the official bid.

The bids for the project were prepared by plaintiff and placed in the packet for Cheesman's review and revision before it went to City Council.  PSAMF#11. Cheesman would have seen the bids before the packet went to Council.  On the 29th plaintiff sent an e-mail to Sean asking him to review the past paragraph of the staff report (the fourth version) and that she had talked to Cheesman about it and had added what he wanted.  PSAMF#12.  The staff report indicated that there was a lifetime warranty on the labor from CarpetOne.

The project was approved by City Council and nothing more was heard on the subject until March 9 when Klaphake sent an e-mail to Cheesman stating, " I think the warning about inappropriate altering of the bid process needs to be put in writing due to the seriousness of the problem."  PSAMF#14.  Yet even then nothing was done.  When Cheesman asked plaintiff about it and he thought she was lying to him nothing was done.  PSAMF#15.

It wasn't until July 10, 2012, that plaintiff finally received the discipline for the bidding on the senior center flooring project, more than six months after the project was

approved, and more than four months after Klaphake asked for her to receive a written warning. PSAMF#17. There was nothing in the termination notice to indicate that the failure to obtain three bids was inappropriate and in fact Cheesman justified going with CarpetOne even though it was not the lowest bidder based upon the fact it had offered a lifetime labor warranty. Id.

Cheesman lied in the termination memo about two important things – his not knowing that Troy Von Roenn owned TVR Tiles at the time, and that he had recently learned that CarpetOne's bid had been "prepared by" Troy Von Roenn. PSAMF#18, 20. Nothing in the termination notice stated that Ms. Lester had a duty to notify Cheesman that her friend Troy was going to do the installation work for CarpetOne. That is because she had placed the bid in the packet so Cheesman, Sean, and Klaphake all knew who was going to do the installation work.

Finally, Sean, who knew that his brother owned TVR Tiles and would be doing the installation work for CarpetOne before the packet went to City Council, received no discipline whatsoever for failing to bring this up to Cheesman or Klaphake. PSAMF#21.

The preceding shows that Ms. Lester was not the only person responsible for this project, that Cheesman approved of Lester's failure to obtain a third bid, approved of her decision to go with CarpetOne which would have entailed a restocking fee once a third lower bid was received from Hunter and that he and Sean both knew that Troy owned TVR Tiles and would be doing the labor for CarpetOne. Their knowledge and approval of plaintiff's actions and the lack of discipline given to Sean show that the reason(s) given for Ms. Lester's termination were not the real reasons.

V.     PLAINTIFF'S EVIDENCE OF PRETEXT IS ENOUGH TO SATISFY
       THE PROOF REQUIREMENTS OF THE REHAB ACT

Defendant argues that plaintiff cannot prove that her termination was "solely"

because of her daughter's disability pursuant to the terms of the Rehab Act.  While

Defendant is correct insomuch as that the standard is different from the ADA, the

implication of its argument is not accurate.  Plaintiffs may prove that the Defendant's

adverse action was motivated "solely" on account of a person's disability without having

to prove anything beyond the fact that the reasons given by the employer were not the

real reasons and that there is an inference of discrimination.  The U.S. Supreme Court

held in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S. Ct. 2097

(2000) that a plaintiff is not required to produce evidence over and above pretext in

order to win at trial; ie "pretext-plus."

## CONCLUSION

Because plaintiff has shown that there are genuine disputes of material facts as

set forth above, she respectfully requests the court deny Defendant's Motion for

Summary Judgment and set this case for trial.

Dated this 22nd day of September, 2014.

Respectfully submitted,

By:     *s/Ralph E. Lamar, Esq.*
        Ralph E. Lamar, Esq.
        8515 Braun Loop
        Arvada, CO 80005
        (303) 345-3600
        ralphlamar@ymail.com
        Attorney for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I, Ralph E. Lamar, IV, Esquire hereby certify that on this the 22nd day of

September, 2014, I caused a true and correct copy of Plaintiff's Brief in Opposition to

Defendant's Motion for Summary Judgment to be served by via U.S. Mail First class

delivery, and/or facsimile, or electronic mail upon counsel for Defendant as listed below:

Marni N. Kloster
Nathan, Bremer, Dumm & Myers, P.C.
7900 East Union Avenue
Suite 600
Denver, CO 80237

By:   *s/Ralph E. Lamar, IV*
      RALPH E. LAMAR, IV
      ATTORNEY FOR PLAINTIFF